Filed 3/28/13  P. v. Franklin CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B238804 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA114379) |
| v. | |
| MARCELLE LEON FRANKLIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Laura R. Walton, Judge.  Affirmed.

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Kimberley J. Baker-Guillemet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Marcelle Leon Franklin of willful, deliberate and premeditated attempted murder (Pen. Code, §§ 664, 187, subd. (a))[1] (count 1); possession of a firearm by a felon (§ 12021, subd. (a)(1)) (count 2); and assault with a firearm (§ 245, subd.(a)(2)) (count 5). In count 1, the jury found that defendant personally used and discharged a firearm within the meaning of section 12022.53, subdivisions (b) through (d). In counts 1 and 3, the jury found that defendant inflicted great bodily injury within the meaning of section 12022.7, subdivision (a). In count 3, the jury found defendant personally used a firearm within the meaning of section 12022.5, subdivision (a).[2] In all three counts the jury found true the gang enhancements under section 186.22, subdivision (b)(1).

The trial court denied defendant's *Romero* motion[3] and found true the allegation that defendant had two prior "strike" convictions pursuant to sections 1170.12, subdivisions (a) through (d), and 667, subdivisions (b) through (i); two prior serious felony convictions pursuant to section 667, subdivision (a)(1); and three prior prison terms pursuant to section 667.5, subdivision (b).

The court sentenced defendant to a total of 80 years to life in prison. In count 1, attempted murder, the sentence consisted of the base term of 15 years to life, tripled to 45 years to life pursuant to the three strikes law, plus a consecutive term of 25 years pursuant to section 12022.53, subdivision (d), and two 5-year consecutive terms pursuant to section 667, subdivision (a)(1). In count 2, the court imposed a concurrent term of 25 years to life. In count 3, the trial court stayed the sentence of 48 years to life pursuant to section 654.

Defendant appeals on the grounds that: (1) the evidence was insufficient to support the gang allegation, and the gang enhancements must be stricken; (2) the trial

---

[1]    All further statutory references are to the Penal Code unless otherwise specified.

[2]    Count 3 in the verdict forms was count 5 in the information.

[3]    *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

court prejudicially erred in admitting testimonial hearsay evidence as the basis of the expert's opinion on the gang allegation, which violated defendant's right of confrontation; and (3) the admission of testimonial hearsay evidence violated defendant's right of confrontation and was prejudicial in regard to the finding of premeditation.

## FACTS

**Prosecution Evidence**

Ricky Ogilvie and Gregory Moore, the victim, were cousins. Moore, Ogilvie, and defendant were members of the Bounty Hunter Bloods gang. "Footbush" is defendant's gang name. Moore loved defendant. Ogilvie had been friends with defendant for over 10 years and considered him to be "family." Defendant was respected within the gang. Ogilvie was afraid of testifying because it was dangerous for him and his family. Prior to the shooting of Moore, Ogilvie had no ill-will towards defendant.

During the early morning of July 24, 2010, Ogilvie drove Moore to a house near 114th Street and Maie Avenue and left him there. Later, Ogilvie returned to the location and saw defendant pacing back and forth, seemingly agitated. There was a young woman there who was grabbing defendant's shirt and "trying to . . . stop him." Defendant stormed off and got in a car and left.

Ogilvie later drove to his and Moore's grandmother's house on 113th Street, a block away from the house where he had seen defendant. Moore was standing in the street in front of their grandmother's house. Moore's T-shirt was ripped, and he had blood on his arms and shoulders. Moore was pacing back and forth and seemed excited, "but not in a good way." He appeared to be in disbelief. An older member of the Bounty Hunter Bloods called Spike arrived on a bicycle. Moore said, "Fuck 5-Line"and immediately attacked Spike. "5-Line" refers to 115th Street and is a crew within the Bounty Hunter Bloods. Moore's statement would be an extremely disrespectful thing to say. Ogilvie tried to break up the fight. After he did so, defendant then "walked up on us, said 'Hello' and started shooting" Moore.

3

Before defendant shot him, Moore tried to turn around and run, but the first shot pierced him, and he fell. Moore had no weapons. Defendant then got closer to Moore, stood over Moore and shot him between three and four more times. After defendant shot Moore, he walked away. Because he feared for his safety, Ogilvie told police at the shooting scene that he was not present during the shooting.

Officer Alex Frazier, of the Los Angeles Police Department (LAPD), responded to the scene of the shooting at approximately 1:30 in the morning on July 24, 2010. Upon arriving, Officer Frazier saw Moore in the middle of the street, rolling around in pain as he was helped by paramedics. Frazier accompanied Moore to the hospital in the ambulance.

At the hospital, Moore was screaming and appeared to be in a lot of pain. Officer Frazier asked Moore who had shot him, and Moore said, "'Marcelle Footbush'" When Frazier asked what Marcelle's last name was, Moore replied, "'Franklin.'" Moore said that Footbush was his street name. Frazier later heard Moore screaming, "Please don't let me die. Please don't let me die."

Donald Hamilton, a registered nurse in the emergency department at St. Francis Medical Center, treated Moore for multiple gunshot wounds. Moore was in shock and in pain. Hamilton heard Moore repeatedly say that "Fu-Bush" did it. Moore was in "bad shape," and his wounds were potentially fatal.

Officer Manuel Moreno, of the LAPD, was assigned to investigate Moore's shooting. He spoke with Moore at St. Francis Medical Center on July 26, 2010. Officer Moreno asked Moore who had shot him, and Moore replied that it was, "Footbush." Moore clarified that Footbush's true name was Marcelle Franklin.

Counsel stipulated that Moore was examined on July 24, 2010, and found to have six gunshot wounds, including one in his chest, two in his abdomen, one in his left arm, one in his right arm, and one in his back. Since October 2010, as a result of his gunshot wounds, Moore had been in a vegetative state that was expected to be permanent.

Officer Francis Coughlin of the LAPD testified as a gang expert. He is the senior lead officer assigned to the Nickerson Gardens Housing Development, which was

territory claimed by the Bounty Hunter Bloods. Community members are extremely fearful of the gang. The gang is notorious for robbing Hispanic victims. The African-American residents of the complex are fearful because most of them were related to Bounty Hunter Bloods. Respect and reputation are very important within the Bounty Hunter Bloods.

When a gang member provides information to law enforcement or is a witness in a court case against another gang member it is known as "snitching." The Bounty Hunter Bloods have a rule that, "if you snitch, you're subject to die." This rule allows them to commit crimes in broad daylight without fear of anyone reporting them or cooperating with law enforcement.

Officer Coughlin testified about the primary activities of the Bounty Hunter Bloods. He also described three separate crimes committed by members of the Bounty Hunter Bloods against other members of the gang. Sometimes gang members "disciplined" other gang members when they fell out of line with the gang structure or went against the gang rules. The shooting of Moore was consistent with gang activity.

Officer Coughlin was assigned as a co-investigator on the Moore shooting. Officer Coughlin knew Moore through past arrests and his gang ties. There are "sets" or "cliques" within the gang and Moore was a member of the Block Boys set of the Bounty Hunter Bloods. Officer Coughlin knew Ogilvie to be a member of the Bounty Hunter Bloods as well. Officer Coughlin was also familiar with defendant. Defendant had several tattoos consistent with membership in the Bounty Hunter Bloods. One tattoo read, "BB" for "Block Boys." Officer Coughlin was of the opinion that defendant was a member of the Bounty Hunter Bloods gang at the time of the shooting. Defendant had admitted that he was a gang member in the past. Officer Coughlin had had past law enforcement-related contacts with defendant. Footbush had been defendant's gang moniker the entire 10 years Officer Coughlin had known him. Officer Coughlin believed that defendant was a shot-caller based on his reputation, conversations with gang members, and his involvement in investigations.

Officer Coughlin and his partner, Officer Moreno, spoke with Moore in October 2010, before Moore slipped into a permanent vegetative state. Moore stated that defendant and Moore had a fight "possibly over a girl" prior to the shooting. Moore won the fight. Defendant stabbed Moore.

Defendant and Moore had been lifelong friends. Moore was less respected than defendant within the gang because Moore had testified as a witness in a criminal trial against another Bounty Hunter Bloods member in the past.

In response to a hypothetical question posed by the prosecutor based on the facts of the case, Officer Coughlin was of the opinion that defendant's shooting of Moore was in association with the Bounty Hunter Bloods, based on the rules of the gang. If a shot-caller was beaten up by a lower ranking member of the gang and did not go after the lower ranking member, the shot-caller would lose credibility. The fact that the shooting took place in front of other Bounty Hunter Bloods was significant because "there's no fear that these Bounty Hunter Bloods will cooperate with law enforcement because they are part of the structure." Making disrespectful statements such as "Fuck 5 Line" would also show a need for discipline.

Officer Coughlin also believed that defendant's act of shooting Moore was for the benefit of the Bounty Hunter Bloods gang. The shooting benefited the shooter because it enhanced his status within his own gang and with other gangs. It benefited the entire gang because it helped with recruiting new members who respect violent crimes. The shooting also benefited the gang because it helped instill more fear in the members of the community and sent the message that if "'you want to go against this gang, this is what can happen to you.'"

**Defense Evidence**

Quinishia Washington and defendant were "good friends" at the time of the shooting. July 23, 2010, was Washington's birthday. Washington picked up defendant at approximately 5:00 that afternoon. They went to her home until 8:30 p.m. and then left for the movies. They sat in the car until the film began at 10:30. They watched the film for an hour and left. They then went to the home of defendant's sister in Orange County.

6

They arrived there before midnight, and Washington went to bed shortly after midnight. She knew that defendant came into the bed with her that night because when she woke up the next morning at 9:00 a.m. he was there. She and defendant left defendant's sister's house at approximately 10:00 a.m. that morning.

At the time of trial, Washington no longer considered herself to be a good friend of defendant. She was upset with him and did not wish to testify. She had found out that she was not his only girlfriend. Washington would not lie for defendant.

During Washington's cross-examination, the People played for the jury portions of recorded telephone conversations. The first conversation took place between defendant and Washington's grandmother while defendant was incarcerated for Moore's shooting. Washington's grandmother chided him for dragging Washington into something she did not have anything to do with. Defendant said he did not drag her into it because she decided. Defendant told Washington's grandmother that Washington was picking up money from his "homies." Defendant had called his homies to put some money on his "books" in prison and they told him that they had already given it to Washington.

The second and third conversations were between defendant and Washington. In the second conversation, defendant asked Washington, "Did he give you the money?" Washington replied, "Yeah." Washington acknowledged that the conversation took place sometime after defendant was arrested in September 2010 in connection with the instant case.

In the third conversation, defendant told Washington that he knew she was very strong. He said she had raised Midnight, Dre, and Willie and taught them "the gangster shit." Defendant stated, "You the one that made them gangster hard and not scared and shit. They follow behind you now . . . ." In that conversation, defendant also told Washington that if she wants a "piece," she should just let him know. Washington testified that a piece meant a gun. Washington acknowledged that this conversation had also taken place sometime after defendant was arrested in September 2010 in connection with the instant case. Washington was not in a gang. Defendant had referred to her three cousins. She had given them their "backbone" so that no one would "run over them."

Nakeisha Moore[4] is defendant's younger sister. On July 23, 2010, defendant and Washington came to Nakeisha's Anaheim home before midnight to celebrate Washington's birthday. Defendant and Washington slept over at Nakeisha's house that evening. Defendant went to sleep at approximately 2:00 in the morning on July 24, 2010. When Nakeisha woke up at approximately 10:30 a.m. later that morning, one of her sons told her that defendant was no longer at the house. Nakeisha told an investigator that defendant and Washington left at approximately 10:00 a.m. that morning. Nakeisha would not lie for her brother.

On July 24, 2010, Brenda Arana had lived in a house on the same block as Moore for approximately six months. Arana recognized Moore as her neighbor and the shooting victim. At 1:00 a.m. that morning, Arana and her husband were coming home from work. Arana and her husband went to bed but were awakened by noise being made by Moore who was "fighting alone outside." Through her window, Arana saw Moore in front of her house throwing a bicycle at the driver's side window of a white car several times. Moore was yelling at some women. At some point a white car arrived and two men got out. One of them was the owner of the car that Moore was vandalizing. Moore began hitting the driver of the car that had just arrived. The driver was texting. Several "guys" came out of a house and separated Moore and the car's driver. When they left, another man came out with a gun and shot it. The man with the gun directed himself towards Moore and shot him a total of eight times. There were several people crowded together along with the shooter. The shooter was wearing a black shirt, and he wrapped the pistol with it. Arana had seen Moore and the shooter together in either October or December of 2009. They had fought at that time. All the friends who had come out to pull the fighters apart were there at the time of the shooting.

When officers on the scene of the shooting asked Arana if she could recognize anyone from photos they showed her, she said that she could not because everything was

---

**4**   We refer to Nakeisha Moore by her first name because she has the same last name as the victim.

dark. She told the police and a defense investigator that she did not get a very good look at the shooter and would not be able to identify him.

Arana testified at trial that she had seen the shooter. Arana was directed to look at defendant, and Arana said she was sure that defendant was not the shooter. Arana was nervous about testifying because she was afraid that gang members might hurt her or her son for testifying.

**Prosecution Rebuttal Evidence**

Officer Manuel Moreno testified that in August 2010 he spoke with Arana on the telephone in connection with this case. Arana told him that "she didn't see anything and didn't want to be involved with the police on this matter."

Officer Coughlin testified that the information that defendant's girlfriend was out collecting money from his homies for defendant would confirm his opinion that defendant was a shot-caller and that the crimes at issue in this case were committed for the benefit of the Bounty Hunter Bloods gang. He confirmed that one of the bases for his opinion that defendant's shooting of Moore was in association with, and for the benefit of, the Bounty Hunter Bloods gang was related to defendant's higher status in the gang in relation to Moore's status. On cross-examination, he acknowledged that an incarcerated individual who is asking to have money collected and put on his books is not necessarily a shot-caller, nor does calling someone "homie" necessarily indicate that a person is involved in gang activities.

Officer Coughlin confirmed that a "piece" is a gun. If an incarcerated individual tells another person that they can get them a "piece," it is indicative that the incarcerated individual still has influence out on the street. Officer Coughlin believed that defendant was the highest ranking shot-caller of the Bounty Hunter Bloods.

**DISCUSSION**

## I. Sufficiency of the Evidence—Gang Allegation

### A. *Defendant's Argument*

Defendant contends there was no credible evidence that he shot Moore for the benefit of, at the direction of, or in association with, a criminal street gang. There was

9

also a lack of credible evidence that the crimes were committed with the specific intent required under the gang enhancement. Because the evidence was insufficient, the true finding and imposition of sentence for the gang enhancement violated defendant's right to due process under the Fourteenth Amendment to the United States Constitution.

### B. Relevant Authority

Section 186.22, subdivision (b)(1) provides for a sentence enhancement when the defendant is convicted of enumerated felonies "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." In reviewing the sufficiency of the evidence, the question on appeal is whether there is substantial evidence from which a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant's guilt beyond a reasonable doubt. (*People v. Rayford* (1994) 9 Cal.4th 1, 23.) Substantial evidence is that which is reasonable, credible and of solid value. (*People v. Cuevas* (1995) 12 Cal.4th 252, 260.) The standard of review is the same when the People rely principally on circumstantial evidence. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1329.) The substantial evidence standard of review also applies to section 186.22 gang enhancements. (*People v. Augborne* (2002) 104 Cal.App.4th 362, 371.)

"In making this determination, we '"must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" [Citation.]" (*People v. Rayford*, *supra*, 9 Cal.4th at p. 23; accord, *People v. Cuevas*, *supra* 12 Cal.4th at pp. 260-261.) "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Conflicting inferences are to be resolved by the jury. (*People v. Millwee* (1998) 18 Cal.4th 96, 132.)

Although all reasonable inferences must be drawn in support of the judgment, the court "may not 'go beyond inference and into the realm of speculation in order to find support for a judgment. A finding . . . which is merely the product of conjecture and

surmise may not be affirmed.'"  (*People v. Memro* (1985) 38 Cal.3d 658, 695, disapproved on another point in *People v. Gaines* (2009) 46 Cal.4th 172, 181; accord, *People v. Waidla* (2000) 22 Cal.4th 690, 735.)

### C. Evidence Sufficient

With respect to the first element of the gang enhancement that he challenges, defendant contends that, since he alone was involved in the shooting, and no one directed him to shoot Moore, he necessarily must have committed the crime for the *benefit* of the gang in order for the allegation to be true.  According to defendant, Officer Coughlin's opinion as to this factor was speculative and devoid of facts to support it.  Officer Coughlin's opinion was essentially that a crime that enhances a gang member's status within the gang benefits the gang as a whole.  If this were correct, defendant argues, any crime of violence committed by a gang member would be a gang crime under section 186.22, subdivision (b).

We disagree with defendant's claim.  Generally speaking, where a gang enhancement is alleged, expert testimony concerning the culture, habits, and psychology of gangs—including the motivation for an individual member's actions—is permissible, and a jury may rely on such testimony to render a finding on the allegation.  (*People v. Ward* (2005) 36 Cal.4th 186, 210; *People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*).)  Considering the expert testimony in conjunction with the remaining evidence, the jurors in this case reasonably could have concluded that defendant committed the crime for the benefit of *and* in association with his gang rather than for personal reasons.

Officer Coughlin testified that he had been a police officer for more than 16 years and had received extensive training on gangs.  He had also provided training on gangs to other officers and had testified as an expert numerous times regarding gangs, with a focus on the Bounty Hunter Bloods.  He had numerous contacts with gang members and derived his knowledge partly from these contacts.  In areas where the Bounty Hunter Bloods are active, the community is extremely fearful of them and of cooperating with law enforcement.  Officer Coughlin stated that the gangs sustain themselves on respect,

11

which is earned by committing violent crimes, especially with guns, that create an atmosphere of intimidation in the community. They are then able to commit their crimes openly, which gains them even more respect. He believed the Bounty Hunter Bloods gang was one of the toughest in Los Angeles. The gang had a definite structure, and shot-callers are at the top.

Based on his contacts with gang members and his own investigations, Officer Coughlin knew that snitching is greatly frowned upon by the gang. Officer Coughlin described the murder of one of his informants within the gang by a gang member named Christopher Glasgow. He testified about another murder within the Bounty Hunter Bloods by Bobby Ivory. Ivory was bested in a fight by another gang member, and Ivory responded by shooting and killing that gang member. He described a third intra-gang killing where one gang member, Rashad Fair, shot another as a form of discipline. It is well known within the gang that it is up to those in the hierarchy to discipline a gang member in order to send a message to anybody else who wants to fall out of line.

Moore testified against Bobby Ivory as a reluctant witness. Officer Coughlin believed that Moore's testimony put his gang status, which was formerly "solid," in question. Officer Coughlin believed defendant was a shot-caller. Moore and defendant fought before the shooting, and Moore won.

The prosecutor presented Officer Coughlin with a hypothetical that mirrored the facts surrounding Moore's fight with defendant and Moore's shooting and asked Officer Coughlin whether the charged crimes stemming from the shooting were in association with the Bounty Hunter Bloods. Officer Coughlin stated that they were, since the shooting was done in accordance with the rules of discipline of the Bounty Hunter Blood gang and hence in association with the gang because "you have to back your rules." Moreover, the shooting was done in front of other Bounty Hunter Blood members, and defendant clearly had no fear that these witnesses would cooperate with law enforcement because they were part of the structure.

Officer Coughlin was of the opinion that the crimes were also committed for the benefit of the gang. The shooting enhanced the shooter's reputation and that of the entire

12

gang.  The younger members of the gang look up to that kind of behavior, and it helps with recruiting new gangsters.  More members make the gang stronger.  The respect that sustains a gang is enhanced and an atmosphere of fear and intimidation in the community is created by a murder being committed in public view.  This fear allows the gang to continue their criminal enterprises.  It also sends a message to other gangs that "this gang is ruthless." They are warned to stay away, "and it works."

Moreover, in addition to Moore's transgression of testifying against a fellow gang member, he had attacked an older member of the gang, Spark, just before the shooting.  The fight occurred because Moore said, "Fuck 5 line" to Spark.  Given the presence of other gang members, and the effect of shooting Moore in front of them, it is clear that defendant committed the instant crimes in association with and for the benefit of the Bounty Hunter Bloods gang.

With respect to the specific intent element, defendant points out that he did not flash any gang signs or shout gang slogans.  There was no evidence that he boasted about the crime, and his defense was that he was not even present at the shooting.  There was no evidence that defendant thought or cared about the gang when he shot Moore.  Instead, the evidence was overwhelming that the crime was personal and defendant's intent was personal.

Again, we disagree.  Given the circumstances of the shooting, where other gang members from the same gang were present, there was no need to shout a gang slogan or display gang signs.  This was not a crime where it was necessary to announce a gang affiliation, as occurs when a crime is committed against a rival gang or a stranger.  Likewise, there was no need to boast about this crime.  As Officer Coughlin testified, "word always gets out," and news of the shooting was sure to be spread.  Imposing discipline on a gang member who had disobeyed several major rules protected the gang's reputation and gained respect, which tends to show that defendant had the intent to promote his gang's criminal activity.  This activity is their lifeblood and is dependent on the gang's stature.

13

Defendant's case is unlike *In re Frank S*. (2006) 141 Cal.App.4th 1192 (*Frank S*.), on which he partially relies. On appeal, the minor argued there was insufficient evidence he possessed a dirk or dagger for the benefit of the gang with "the specific intent to promote, further, or assist criminal gang behavior." (*Id*. at p. 1195.) The appellate court reversed the juvenile court's true finding on the gang allegation stating, "We publish this case to emphasize that crimes may not be found to be gang-related based solely upon a perpetrator's criminal history and gang affiliations." (*Id*. at pp. 1194-1195.) The court explained that the prosecution presented only the gang expert's opinion concerning gangs in general and her improper opinion on the ultimate issue of minor's intent. (*Id*. at pp. 1195, 1199.) The court stated the prosecution presented no evidence the minor was in gang territory, was with gang members, or that he expected to use the knife in a gang-related offense. (*Ibid*.) The *Frank S*. court stated that "'[t]he crime itself must have some connection with the activities of a gang, which we conclude means a "criminal street gang" . . . .' [Citation.] . . . While evidence established the minor has an affiliation with the [criminal street gang], membership alone does not prove a specific intent to use the knife to promote, further, or assist in criminal conduct by gang members. [Citation.]" (*Id*. at p. 1199.)

In this case, defendant was in friendly territory in the presence of fellow gang members. He shot a wayward gang member numerous times in front of everyone and walked away. Officer Coughlin's testimony, combined with the other evidence presented and inferences that reasonably can be drawn from that evidence, distinguishes this case from that of *Frank S*. It was for the jury to assess the weight of Officer Coughlin's testimony in the first instance, and if we believe that any rational juror could have been convinced by it, "we cannot deem it insufficient. [Citation.]" (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1384.) Viewed in the light most favorable to the prosecution, there was credible and solid evidence supporting the reasonable inference that defendant committed the instant offenses in association with, and for the benefit of, the Bounty Hunter Bloods gang, and that that he intended to further the gang's criminal conduct by

14

so doing. (§ 186.22, subd. (b); see *People v. Morales* (2003) 112 Cal.App.4th 1176, 1197-1198.) Defendant's argument is without merit.

## II. Officer Coughlin's Testimony About Moore's October 2010 Interview with Respect to Gang Allegation

### A. *Defendant's Argument*

Defendant contends that the trial court prejudicially erred by allowing Officer Coughlin to testify about a conversation with Moore on the basis that it was nonhearsay. Defendant argues that the evidence was testimonial hearsay, and its admission violated his Sixth and Fourteenth Amendment right to confront and cross-examine his accuser.

### B. *Relevant Authority*

The confrontation clause of the Sixth Amendment of the United States Constitution provides that "'[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" (*Crawford v. Washington* (2004) 541 U.S. 36, 42 (*Crawford*).) The confrontation clause has traditionally barred "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford*, at pp. 53-54.) "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822.)

An expert may generally base his or her opinion on any matter known to the expert, including hearsay not otherwise admissible, which may "reasonably . . . be relied upon" for that purpose. (Evid. Code, § 801, subd. (b); see *Gardeley*, *supra*, 14 Cal.4th at pp. 617-619; *People v. Montiel* (1993) 5 Cal.4th 877, 918 [expert may explain the reasons for opinion even if these include hearsay not otherwise admissible, but prejudice might arise if incompetent evidence is brought before the jury "'under the guise of reasons'"].)

## C. Proceedings Below

The trial court held a hearing under Evidence Code section 402 regarding Moore's statements to Officer Coughlin. The prosecutor explained that in October 2010, Officers Moreno and Coughlin visited Moore in the hospital, and Moore confirmed to them the events that preceded his shooting—events that Moore had already recounted to Officer Moreno in a July 26, 2010 interview. These events included an altercation with defendant in which Moore got the better of defendant, and the stabbing of Moore by defendant. Officer Coughlin would testify that, given defendant's status within the gang, being disrespected in that way required him to retaliate. Officer Coughlin was going to rely on these statements as part of the basis for his opinion that the crime was committed for the benefit of the gang, but the statements were not being offered for their truth.

Officer Coughlin testified at the hearing. He said he heard Moore confirming the details of the events as they were restated to him by Officer Moreno. Moore had originally told Moreno about these events in July 2010. Officer Coughlin told the court why he believed the shooting benefited the gang, just as he later testified before the jury. He stated that his and Officer Moreno's purpose in visiting Moore was to get his approval for a "televised" interview, but they found that his medical condition had deteriorated and he could only whisper. Officer Coughlin said that, in forming his opinion on the gang allegation, he had relied on the information that Officer Moreno obtained from Moore, on Moore's confirmation of it, and on Ogilvie's statements as part of the basis of his opinion. These sources together formed approximately one-third of the basis of his opinion. Officer Coughlin assumed that Moore's statements were true. The other two-thirds of his opinion were based on 15 years of experience of working with the Bounty Hunter Bloods, the knowledge that this type of incident happened quite often, and his conversations with citizens, gang members, and his confidential informants.

The court stated that it gave weight to the factor that Officer Coughlin actually assisted in the investigation of Moore's shooting—this made the information more reliable. It would allow Officer Coughlin to testify to the statements Moore made about the events preceding his shooting. The court intended to admonish the jurors that the

16

information was not being offered for the truth of the matter asserted, but rather to show motive, and that the expert was relying on the information as part of his expert opinion as to why the crime was gang related. The court believed that Moore's statement was tantamount to motive testimony, and whether it was true or not, it was admissible to show a motive for the underlying act.

Defense counsel argued that the jurors would be told it was not being offered for the truth, but the officer's opinion had to be based on the facts being true in order to make his opinion effective. The court replied that defense counsel could cross-examine the officer on his assumption that the facts were true. The trial court was taking into account that the officer's opinion was based upon more than that interview. Counsel replied, "Okay" and went on to inquire about other matters.

During direct examination before the jury, the prosecutor asked Officer Coughlin if he had had the opportunity to speak with Moore in October at the hospital. The prosecutor then asked if Officer Moreno had gone over a previous interview with Moore. Officer Coughlin replied "yes" to these questions. The prosecutor asked if Officer Coughlin learned about or discussed an altercation that defendant had with Moore prior to being shot. The trial court overruled defense counsel's hearsay objection. Officer Coughlin explained that Moore confirmed that he and defendant had a fight—possibly over a girl—that Moore won the fight, and that defendant stabbed Moore and later shot him. The trial court told the jury, "The statements that Officer Coughlin just attributed to the alleged victim in this case, Mr. Moore, those statements are, in fact, hearsay statements. However, because Officer Coughlin is an expert in this case, he can rely on those statements as the basis and to rely on those statements for his opinions in this case. The court did not allow the statements that they are, in fact, true; just that Officer Coughlin heard them from Mr. Moore and has now relied on those statements as the basis of his opinions in the case. Do you understand that? Thank you." Shortly thereafter, the prosecutor asked Officer Coughlin a hypothetical question in which he was asked to assume as true that "the lower ranking member got the better of the higher ranking shot-caller in a fight."

17

During cross-examination, defense counsel confirmed that the October visit was not documented by Officer Coughlin in any police report, and, to his knowledge, no one else had documented it. With respect to Moore "allegedly" making some statements about a fight he had with defendant, defense counsel asked if, assuming that was true, did Moore ever say that defendant yelled out the gang name or wore gang colors. She also asked if it was fair to say "it could just have been that any conversations they've had together is a private dispute and have nothing to do with gangs?" Coughlin replied that even if that were true, "it still, in my opinion, escalates into gangs."

The trial court instructed the jury with CALCRIM No. 332 on expert opinion,[5] CALCRIM No. 360 on statements to an expert,[6] and with CALCRIM No. 370 on motive.[7]

---

[5] The trial court read CALCRIM No. 332 as follows: "A witness was allowed to testify as an expert and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence. An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion."

[6] CALCRIM No. 360 was read as follows: "Officer Coughlin testified that in reaching his conclusions as an expert witness, he considered statements made to him by Gregory Moore and gang members. You may consider those statements only to evaluate the expert's opinion. Do not consider the statements as proof that the information contained in the statements is true."

[7] CALCRIM No. 370 was read as follows: "The People are not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict you may, however, consider whether the defendant had a motive. Having a

18

### D. Any Error Harmless

Preliminarily, we agree with the Attorney General that defendant has forfeited the right to raise the issue on appeal. (Evid. Code, § 353; *People v. Tafoya* (2007) 42 Cal.4th 147, 166 [defendant's failure to raise confrontation clause claim at trial forfeits issue on appeal]; see also *People v. Redd* (2010) 48 Cal.4th 691, 730 & fn. 19; *People v. Chaney* (2007) 148 Cal.App.4th 772, 779.) Defendant made no objection to Officer Coughlin's testimony about the October 2010 interview on the basis of *Crawford* and the confrontation clause. Consequently, any confrontation clause claim is forfeited. In any event, we conclude that any error in admitting the testimony was harmless.

Defendant contends that the questioning of Moore by Officers Coughlin and Moreno was an interrogation with the purpose of producing evidence against him in a manner designed to deny him the constitutional protections of the Sixth Amendment. It was error to admit this evidence under the guise of expert opinion. It was prejudicial because it was the only evidence tending to show that the shooting of Moore was a gang crime. Absent this evidence, the jury had only Ogilvie's testimony. Because Officer Coughlin admitted that the evidence was one-third of the basis of his opinion, defendant argues, it was very significant. He contends that the judgment with respect to the gang enhancement must be reversed.

In *People v. Thomas* (2005) 130 Cal.App.4th 1202 (*Thomas*), Division Two of the Fourth Appellate District considered *Crawford* in the context of a defendant's challenge to testimony by a gang expert. The defendant in *Thomas* contended that "his right to confront witnesses was violated by the admission of hearsay evidence in the form of the gang expert's conversations with other gang members in which they identified defendant as a gang member." (*Thomas*, at p. 1208.) The appellate court observed that "[t]he rule is long established in California that experts may testify as to their opinions on relevant matters and, if questioned, may relate the information and sources on which they relied in

---

motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

19

forming those opinions.  Such sources may include hearsay.  (*Id*. at p. 1209, citing Evid. Code, § 801, subd. (b), & *Gardeley*, *supra*, 14 Cal.4th at pp. 618-619.)  The appellate court reasoned that "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions.  This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion.  *Crawford* itself states that the confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'  [Citation.]"  (*Thomas*, at p. 1210.)  The appellate court ultimately concluded that, because the statements in the case before the court "were not offered to establish the truth of the matter asserted, but merely as one of the bases for an expert witness's opinion, the confrontation clause, as interpreted in *Crawford*, does not apply.  There was no error in the use of the hearsay statements."  (*Thomas*, at p. 1210; see also *People v. Sisneros* (2009) 174 Cal.App.4th 142, 154.)

Under this authority, as an expert witness, Officer Coughlin could properly testify to the information on which his opinion was based, even if the information was hearsay, provided it was reliable hearsay.  Defendant made no showing that the officer's testimony was founded on unreliable information.

Defendant argues that there is no value to the officer's opinion if it is based on false information.  He asserts that *Thomas* and cases in accord with *Thomas* do not take into account the holdings in *Michigan v. Bryant* (2011) ___ U.S. ___ [131 S.Ct. 1143 (*Bryant*) and *Williams v. Illinois* (2012) ___ U.S. ___ [132 S.Ct. 2221] (*Williams*) for the proposition that the theory of nonhearsay that permits experts to convey the contents of testimonial statements to jurors in explaining their opinions is no longer valid.

We do not believe *Bryant* aids defendant's cause.  In that case, police officers found a shooting victim, who later died, in a gas station parking lot.  (*Bryant*, *supra*, 131 S.Ct. at p. 1150.)  The victim identified the shooter.  The police officers who spoke with the victim testified at the defendant's trial about what the victim had told them.  (*Ibid*.)

20

The Supreme Court held that the primary purpose of the interrogation was to aid the police in meeting an ongoing emergency occasioned by the potential threat to the responding police and the public at large. (*Id*. at pp. 1150, 1156, 1166-1167.) Therefore, the statements were not testimonial. (*Id*. at pp. 1150, 1167.) In defendant's case, there was no claim that the primary purpose for questioning Moore was to meet an ongoing emergency. More importantly, unlike the instant case, the officers in *Bryant* did not testify as experts who merely used the victim's statements as a partial basis for their opinions on an issue, but rather offered the statements for their truth.

Defendant relies heavily on *Williams*, a case that respondent notably fails to discuss, for the proposition that Moore's statements could not have been admitted for anything other than their truth. The statements at issue in *Williams* were those of a prosecution expert who testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police laboratory using a sample of the petitioner's blood. (*Williams*, *supra*, 132 S.Ct. at p. 2227.) In *Williams*, a plurality of four justices held in part that, "Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." (*Id*. at p. 2228.) The plurality offered a second basis for its decision, stating that, even if the report in question had been admitted into evidence, it was not testimonial in that it was not sought for the purpose of obtaining evidence to be used against the petitioner, who was not a suspect at the time. (*Id*. at pp. 2228, 2242-2243.) The plurality observed that "[t]he abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." (*Id*. at p. 2242.)

Justice Thomas joined the four justices of the plurality solely in the judgment. Justice Thomas concluded that the disclosure of Cellmark's out-of-court statements by means of the expert's testimony did not violate the Confrontation Clause for the sole

21

reason that the expert's testimony "lacked the requisite 'formality and solemnity' to be considered '"testimonial" for purposes of the Confrontation Clause." (*Williams*, *supra*, 132 S.Ct. at p. 2255.) (conc. in judgment, Thomas, J.).) Significantly, Justice Thomas stated that "there was no plausible reason for the introduction of [the] statements other than to establish their truth." (*Id*. at p. 2256.)

The remaining four justices joined in a vehement dissent authored by Justice Kagan in which the conclusion that the expert's testimony was not offered for its truth was found to have no merit and was labeled a "prosecutorial dodge." (*Williams*, *supra*, 132 S.Ct. at pp. 2265, 2268) (dis. opn. of Kagan, J.).) Because Justice Thomas also believed that "statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose," the dissent asserted that, "Five justices specifically reject every aspect of [the plurality's] reasoning and every paragraph of its explication." (*Id*. at p. 2257 (conc. in judgment, Thomas, J.).); *id*. at p. 2265 (dis. opn. of Kagan, J.).)

According to defendant, in light of *Williams*, the admission of Officer Coughlin's testimony conveying an absent witness's testimonial statements to the jury, particularly when coupled with CALCRIM No. 332, violated defendant's right to confront the witnesses against him.

It cannot be doubted that Moore's statements to the officers here were testimonial. Both the July and October statements from Moore were obtained with the primary purpose of naming the perpetrator and obtaining evidence to be used against him. (See *People v. Lopez* (2012) 55 Cal.4th 569, 576-577 (*Lopez*).) In addition, a police interview falls into the category of statements made with formality. (*Id*. at p. 581.)

*Lopez* is one of three major cases from the California Supreme Court addressing confrontation clause issues after the *Williams* decision. The others are *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*) and *People v. Rutterschmidt* (2012) 55 Cal.4th 650 (*Rutterschmidt*). All three cases, like *Williams*, were concerned with confrontation clause issues engendered by the results of technical reports whose contents were testified to by someone other than the person who conducted the test. (See *Lopez*, *supra*, 55 Cal.4th at

22

p. 573 [laboratory report on blood-alcohol level]; *Dungo*, at p. 612 [autopsy report]; *Rutterschmidt*, at p. 659 [laboratory reports on presence of alcohol and sedating drugs].) In *Lopez*, the court found no confrontation clause violation because the critical portions of the report on the defendant's blood-alcohol level were not made with "the requisite degree of formality or solemnity to be considered testimonial." (*Lopez*, at pp. 582, 584.) In *Dungo*, there was no confrontation clause violation because the "criminal investigation was not the *primary* purpose for the autopsy report's description of the condition of [the victim's] body; it was only one of several purposes." (*Dungo*, at p. 621.) The *Rutterschmidt* court set forth the confrontation clause arguments by the Attorney General and defendant but concluded only that any error in allowing the laboratory director to testify to the results of two reports by analysts who did not testify was harmless beyond a reasonable doubt, since the evidence of guilt was overwhelming. (*Rutterschmidt*, at pp. 652, 661.)

The *Williams* opinion is clearly a "fractured decision." (*Williams*, *supra*, 132 S.Ct. at p. 2265 (dis. opn. of Kagan, J.).) Nevertheless, because five of the justices disparaged the "nonhearsay" characterization of hearsay statements testified to by an expert as the basis of his or her opinion, *Williams* leaves the viability of *Thomas* in doubt. Justice Liu noted in his dissent to *Lopez* that the nine separate opinions offered by the California Supreme Court in the three confrontation clause cases post-*Williams* reflect "the muddled state of current doctrine concerning the Sixth Amendment right of criminal defendants to confront the state's witnesses against them." (*Lopez*, *supra*, 55 Cal.4th at p. 590. (dis. opn. of Liu, J.).) Justice Liu noted that *Williams* produced no authoritative guidance beyond the result reached on its facts. (*Ibid.*) The majority in *Dungo* observed that the complexities of the case were not easy to resolve in light of the widely divergent views of the justices in *Williams*. (*Dungo*, *supra*, 55 Cal.4th at p. 618.) Justice Chin in *Dungo* stated that the split among the justices in *Williams* made it "difficult to determine what to make of that decision." (*Dungo*, at p. 628 (con. opn. of Chin, J.).) He stated that it was necessary to decide whether there was a confrontation clause violation under Justice Thomas's opinion and whether there was a confrontation clause violation under

23

the plurality's opinion. If there was not, then the result would command the support of a majority from the *Williams* case. (*Dungo*, at p. 629.)

In the instant case, we would find a confrontation clause violation under the plurality's and Justice Thomas's opinions, since the statements given by Moore clearly did not lack the formality required for a testimonial statement. Yet, despite the urging of defendant, we cannot "follow" the dissent and Justice Thomas in their conclusion that out-of-court statements used as a basis for an expert opinion are hearsay, and that classifying such statements as nonhearsay is no more than "a ready method to bypass the Constitution." (*Williams*, *supra*, 132 S.Ct. at p. 2270) (dis. opn. of Kagan, J.).) As stated in *Lopez*, "dissenting opinions are not binding precedent. [Citations.]" (*Lopez*, *supra*, 55 Cal. 4th at p. 585.)

In this case, however, as in *Rutterschmidt*, we may clearly find that any error was harmless. "Violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show 'beyond a reasonable doubt' that the error was harmless. [Citations.]" (*Rutterschmidt*, *supra*, 55 Cal. 4th at p. 661.) "'Since *Chapman* [*v. California* (1967) 386 U.S. 18], we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 608.) "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. [Citations.]" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684.) We conclude that, even if Officer Coughlin's testimony about Moore's

24

confirmation of his prior statements should have been excluded, defendant was not prejudiced by its admission.

Defendant asserts that Moore's statement was the only evidence tending to show that the shooting was a gang crime. The testimony of Ogilvie, however, clearly led to the reasonable conclusion that the crime was gang related. Ogilvie, a gang member, established Moore's and defendant's membership in the gang. He said that Moore loved defendant. Ogilvie explained that it was dangerous and generally "all bad" to testify in court, which was something that Moore had done in the Bobby Ivory case. Ogilvie explained that a gang member gets respect by doing "anything that's wrong." Defendant was respected within the gang. On the day in question, Ogilvie dropped off Moore at a house near 114th Street and Maie Avenue. Ogilvie went back to the house and saw defendant there. Defendant was agitated and pacing back and forth as if something dramatic had happened. A young woman was grabbing defendant's shirt, trying to stop him. Defendant broke loose and stormed off. Ogilvie went back to his grandmother's house where he saw Moore. Moore had blood on his arms and shoulders and appeared to be cut. Moore fought with an older gang member called Spark, and Ogilvie broke it up. Before attacking Spark, Moore yelled, "Fuck 5 Line." "5 Line" was a group within the Bounty Hunter Bloods. This was a very disrespectful thing to say. Ogilvie acknowledged that it would be "a regular Bounty Hunter thing" to go after a Bounty Hunter who was disrespectful to someone who has a lot of respect in the gang. At that moment defendant walked up, said "Hello," and started shooting. When Moore was down, defendant kept shooting him "as if he didn't know him."

We note that Officer Coughlin made only a brief mention of Moore's statement regarding what occurred before the shooting. The prosecutor asked the officer if he learned about a prior altercation between defendant and Moore, and Officer Coughlin said, "Mr. Moore confirmed such events had occurred." The prosecutor asked what the circumstances were that Moore confirmed, and the officer said, "That they had a fight possibly over a girl; that there was a physical altercation between Mr. Franklin and Mr. Moore. Mr. Moore won the altercation. Mr. Franklin stabbed Mr. Moore and then later

25

that night shot Mr. Moore." Immediately thereafter, the trial court admonished the jurors in essence that, merely because the court allowed Officer Coughlin to repeat Moore's statements, it did not meant that Moore's statements were the truth.

Defendant also emphasizes that Officer Coughlin gave the statement a great deal of weight (one-third) in forming his opinion. Yet, a closer look at Officer Coughlin's testimony shows that Moore's statements in October 2010 were only a *portion* of "maybe" one-third of the basis for the officer's opinion. Moreover, the officer's testimony that Moore and defendant might have fought over a girl before the shooting had a tendency to show that the fight may have been personal, and it was perhaps the weakest evidence that the shooting was gang related. Officer Coughlin testified as to other incidents of murder as discipline against a gang member for giving information to law enforcement, diminishing another gang member's respect, or going against gang rules. Officer Coughlin told the jury that when one member of a gang falls out of line with the entire gang structure or goes against gang rules, the gang has to discipline him. It is up to the hierarchy, to which defendant belonged, to discipline a gang member and thus send a message to anyone else who wants to fall out of line. It is how gang members are kept in check. This is universally known within the gang. We note that in arguing to the jury about the gang allegation, the prosecutor did not mention Moore's account of the events prior to the shooting.

In sum, in considering the strength of the prosecution's case that the crime was gang related, we believe that any error in admitting the testimony at issue was harmless beyond a reasonable doubt with respect to the true finding on the gang allegation.

## III.  Admission of Moore's Statements to Police with Respect to the Finding of Premeditation

### A.  *Defendant's Argument*

Defendant makes the same confrontation clause argument as in the previous section, but applies it to both Moore's original interview with Officer Moreno on July 26, 2010, as well as the interview of October 2010 at which Officer Coughlin was present. Defendant contends that the evidence of these interviews was prejudicial with respect to

26

the finding in count 1 that the shooting was willful, deliberate, and premeditated. Absent the erroneously admitted hearsay statements by Moore, the only evidence with respect to this finding was Ogilvie's testimony, and Ogilvie did not see the initial fight between defendant and Moore. Therefore, it cannot be shown beyond a reasonable doubt that the result would not have been more favorable to defendant absent the testimony at issue. According to defendant, the true finding on the allegation must be stricken and the matter remanded for a new trial on the allegation or a new sentencing hearing.

## B. Proceedings Below

Prior to Officer Moreno's testimony, the trial court held an Evidence Code section 402 hearing at the request of the parties. The prosecutor argued that the testimony he intended to elicit from Officer Moreno was admissible as evidence of "fresh complaint" and was intended to corroborate that Officer Frazier had been told the same thing on the night of the shooting. The trial court limited Officer Moreno's testimony to the identification of Footbush, or Marcelle Franklin, as the person who shot him under the theory of fresh complaint. Officer Moreno testified that he went to see Moore in the hospital two days after the shooting. He asked Moore who had shot him, and Moore said, "'Footbush,' that Marcelle shot him." The trial court immediately stated, "Ladies and gentlemen, that testimony that you've just heard from Officer Moreno is not offered for the truth of the matter. It is offered as—it's called nonhearsay—as a statement that Mr. Moore made to Officer Moreno, not necessarily that the actual statement is true." The prosecutor had no further questions, and the defense did not cross-examine Officer Moreno.

As related previously, Officer Coughlin and Officer Moreno visited Moore and had Moore confirm his statements made during the July interview with Officer Moreno, which Officer Moreno did not testify to in front of the jury.

## C. Any Error Harmless

As the record shows, Officer Moreno did not testify to any statements about the events preceding the shooting. Therefore, defendant's argument pertains only to that portion of Officer Coughlin's testimony, recounted in the preceding section, in which

27

Officer Coughlin repeated Moore's account of his fight with defendant. As in the previous section, assuming the issue has not been forfeited by failure to object below, we find the admission of this testimony to be harmless beyond a reasonable doubt on the issue of deliberation and premeditation.

The jury was instructed that "[t]he defendant acted willfully if he intended to kill when he acted. The defendant deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant premeditated if he decided to kill before acting." (CALCRIM No. 601.) The jury was told that the "length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated." (*Ibid*.; see *People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

Ogilvie testified that, while he and Moore stood in front of their mutual grandmother's house, defendant walked up to Moore, said "Hello," and shot Moore from a distance of approximately five feet. Before the first shot, Moore tried to run. When he was hit, Moore fell to the ground. Defendant then went closer and stood over Moore as he shot him several more times. Defendant then walked away. The parties stipulated that Moore suffered a total of six gunshot wounds: one in the chest, two in the abdomen, one in each arm, and one in his back. This evidence alone shows a willful, deliberate and premeditated act. The fact that defendant said "hello" before firing the first shot so that Moore would see what was about to happen and the fact that he stood over Moore and fired at least five shots after the first shot felled Moore are clearly demonstrative of the "cold, calculated judgment" characteristic of premeditated and deliberate murder or attempted murder. (See *People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) The evidence in this case, apart from Moore's statements, revealed "planning activity, a motive to kill, [and] an exacting manner of death," all of which support the true finding on the allegation. (*Ibid*.; see also *People v. Anderson* (1968) 70 Cal.2d 15, 26–27.)

As related previously, Ogilvie also testified about defendant's agitated state outside the house where Ogilvie had dropped off Moore earlier. Ogilvie saw a female trying to dissuade defendant from taking some action, but defendant was not dissuaded

28

and stormed off.   Arana saw Moore fighting with a man who was texting on his phone. Several men came out of a house and separated them.  Then one more man arrived with a gun "and he shot it."  This man "directed himself toward" Moore and shot eight times, according to Arana.  He shot Moore again and again as Moore lay on the ground. Afterward, the shooter wrapped the gun in his black shirt.

Therefore, considering the totality of the evidence, there was sufficient evidence apart from Moore's statements as testified to by Officer Coughlin to support a finding that the attempted murder of Moore was willful, deliberate, and premeditated.  Thus, any error in admitting Coughlin's statements was harmless beyond a reasonable doubt on this allegation as well.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


FERNS, J.*

_____

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.